**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| In re: ) | |
| ) | Case No. |
| ROBIN DELANEY, ) | 12-21924 (ASD) |
| Debtor ) | |
| ) | Chapter 7 |
| ) | |
| DONNA PARRIS, ) | |
| Plaintiff, ) | Consolidated |
| v. ) | Adversary Proceeding |
| ROBIN DELANEY, ) | No. 12-02078 |
| Defendant. ) | |
| ) | |
| In re: ) | |
| ) | |
| CHARLES PAPPAS, ) | |
| Debtor ) | |
| ) | |
| ) | |
| DONNA PARRIS, ) | |
| Plaintiff, ) | |
| v. ) | |
| CHARLES PAPPAS, ) | |
| Defendant. ) | |
| ) | |

**LOCAL RULE 56(a)(1) STATEMENT IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(a)(1) of the Local Civil Rules of the United States District Court for the District of Connecticut, as incorporated by Rule 1001-1(b) of the Local Rules of Bankruptcy Procedure, Plaintiff Donna Parris states that there is no genuine issued to be tried as to the following facts:

1. The plaintiff, Donna Parris, is a person with a disability as a result of her diabetes mellitus, retinopathy, generalized sensory-motor polyneuropathy, bilateral ulnar neuropathy, and

orthostatic hyptension.  *See* Ex. A (Ruling on Plaintiff's Mot. for Preliminary Injunction) at 1-2; Ex. B (Parris Aff.) ¶ 5-6.

2.  Parris's disabilities cause frequent drops in blood pressure that lead to her loss of consciousness, vision problems, significant nerve damage in her extremities, and chronic pain. *See* Ex. A at 2; Ex. B ¶ 7.

3.  As documented by her physician, Parris requires a 24-hour live-in aide to manage her disabilities.  *See* Ex. A at 2; Ex. B ¶ 43.

4.  Parris owns her residence, a mobile home situated on a lot in a mobile home park in Dayville, Connecticut.  *See id.* ¶¶ 2-3.

5.  She rents that lot from the Robin Delaney and Charles Pappas (collectively, the "Defendants"), who own and manage the park through two wholly-owned limited liability companies, Normandies Park LLC and Anna Alexis LLC.  *See id.* ¶¶ 4.

6.  Parris is a judgment-creditor of both Defendants.  *See* Ex. C (Delaney Petition Sched. D) at 1; Ex. D (Delaney Petition Sched. F) at 4; Ex. E (Pappas Petition Sched. D) at 2; Ex. F (Pappas Petition Sched. F) at 3.

7.  The Defendants acknowledge the existence of the judgment-debt in their respective chapter 7 petitions.

8.  According to their schedules, the debt is neither contingent nor even in dispute. *See* Ex. C at 1; Ex. D at 4; Ex. E at 2; Ex. F at 3.

9.  The judgment-debt arose from a civil rights action (the "Civil Rights Action") filed by Parris against the Defendants in the United States District Court for the District of Connecticut, captioned *Parris v. Pappas*, et al., 3:10CV1128(WWE).  *See* Ex. G (Civil Rights

2

Action Docket) at 1-2; *id.* entry 122 at 13 (identifying Parris and the Defendants as parties and entry of judgment).

10. The complaint in the Civil Rights Action (the "Civil Rights Complaint") named as defendants both Pappas and Delaney, as well as their two limited liability companies. *See generally* Ex. H (Civil Rights Complaint).

11. The Civil Rights Complaint alleged that the Defendants failed to maintain the septic system connected to Parris's mobile home as required under the relevant lease. *See id.* ¶¶ 9, 15-16.

12. The Civil Rights Complaint alleged the septic system failed on multiple occasions, causing sewage to flood Parris's lawn and back-up into her home. *Id.* ¶¶ 15-16.

13. The Civil Rights Complaint alleged when the Defendants declined to effect a permanent repair, Parris sought the assistance of local health officials and eventually, the Connecticut Department of Consumer Protection. *Id.* ¶¶ 19, 23-24.

14. The Civil Rights Complaint alleged the Defendants retaliated by threatening to evict Parris from the mobile home park on the grounds that, among other things, an "unauthorized tenant" resided in her home. *Id.* ¶¶ 25-26.

15. The Civil Rights Complaint alleged in response, Parris explained that she was disabled and that the so-called unauthorized tenant was her medically-required live-in aide. *Id.* ¶ 28.

16. The Civil Rights Complaint alleged Parris provided documentation from her physician of her disability and need for a live-in aide, and requested whatever forms were necessary to certify the lawful tenancy of her aide as a reasonable accommodation of her disability. *Id.* ¶¶ 29-30.

17. The Civil Rights Complaint alleged the Defendants declined to grant this accommodation. *Id.* ¶ 29.

18. The Civil Rights Complaint alleged the next time Parris contacted local officials about the persistent problems with her septic system, the Defendants' counsel contacted her with an ultimatum: either Parris agree to pay $300 each time the septic system required servicing or the Defendants would evict Parris and her aide. *Id.* ¶¶ 33-34.

19. The Civil Rights Complaint alleged Parris refused the Defendants' demand and the Defendants promptly initiated an eviction action against her and the aide, again asserting that her aide was an unauthorized tenant and that his presence violated Parris' lease of the lot at the mobile home park. *Id.* ¶¶ 35-36.

20. The Civil Rights Complaint asserted five counts: (i) violations of the Fair Housing Amendments Act, 42 U.S.C. §§ 3601 *et seq.*; (ii) violations of Connecticut's Human Rights Act, Conn. Gen. Stat. § 46a-64c; (iii) breach of contract; (iv) breach of the implied covenant of good faith and fair dealing; and (v) violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110b *et seq*. *See generally id.*

21. The Civil Rights Complaint was filed on July 20, 2010. *See* Ex. G Entry 1 at 3.

22. Upon filing, Parris' counsel mailed the Defendants copies of the summons, complaint, and a request to waive formal service. *See* Ex. I (Bennett-Smyth Aff.) ¶ 5.

23. On August 3, 2010, Attorney Thomas Lonardo (the Defendants' attorney in the eviction action against Parris) informed the Defendants in writing that he would not represent them in the Civil Rights Action without a substantial retainer and warned them of the danger of default if they were slow to respond. *See* Ex. J (Lonardo Letter dated Aug. 3, 2010).

24. On August 18, 2010, Lonardo contacted Parris's counsel and offered to settle the Civil Rights Action. *See* Ex. K (Ruling on Mot. to Reopen) at 2; Ex. I ¶¶ 7-8.

25. After exchanging offers, the parties were unable to come to an agreement. *See* Ex. L (Lonardo Letter dated Sept. 8, 2010).

26. On September 8, 2010, given that the Civil Rights Action had not been settled, Attorney Lonardo warned the Defendants (again in writing) that they should obtain representation because a judgment against them could result in a substantial award in Parris's favor. *See id.*

27. On that same day, Lonardo confirmed for Parris's counsel that he would not be representing the Defendants in the Civil Rights Action. *See* Ex. K at 2; Ex. I ¶ 9.

28. Thereafter, Parris's counsel emailed the Defendants to inquire again whether they would agree to waive formal service of the Civil Rights Complaint and the Defendants never responded. *See id.* ¶¶ 11-12; Ex. K at 2.

29. When Parris subsequently sought to serve the Defendants formally with the summons and complaint, the Defendants attempted to evade service. *Id.* at 4.

30. The Defendants attempt to evade service of process in the Civil Rights Action was detailed in the process server's sworn proof of service, *see* Ex. M (Returned Summons & Certificate of Service) at 2, which states:

> I arrived and knocked at the provided location of 241 Church Street, Brooklyn, CT. No one came to the door; however, I could hear people inside the home. I knocked again, and a child looked out the window to see who was there. I heard the child yell out, "Charlie! That serving guy is back!" Approximately 30 seconds later, the same 13 year old child answered the door. I asked if Charles was there, and he responded, "No." I then asked if his mother was there, and he stated, "No." I knew he was lying as I heard him speak to whom I believe was Charles Pappis [*sic*] when he warned him of my arrival. I also heard a female in the house. The home is about 400 feet off the road, so I left the property and called my office. I spoke with our office manager who advised me to knock again

5

and abode the papers to the son. As I pulled in the driveway, I realized the electric gate at the end of the driveway had been closed behind me. While on the property, I observed a black Lexus with CT plates 170WFN, that I recognized as Robin Delany's car from previous interactions. There was also a white pickup in the driveway.

10/18/10 @ 7:27 PM the house had a few lights on inside and the fireplace was going. There was a white Ford truck with CT plates K40311. I knocked on the door several times with no answer. At this time. I left the papers abode.

31. After the Defendants were successfully served, they declined to appear and defend. *Id.* at 2.

32. On November 19, 2010, the clerk entered the Defendants' default. *Id.*

33. On December 2, 2010, the District Court rendered a default judgment in Parris's favor. *Id.*

34. The District Court scheduled a damages hearing and enjoined the Defendants from evicting Parris from her home. *See* Ex. G Entry 21 at 4; Ex. A at 4.

35. On December 13, 2010, new counsel appeared in the Civil Rights Action on the Defendants' behalf and thereafter moved to set aside the default judgment. *See* Ex. G Entries 25, 27 at 5.

36. The District Court denied the Defendants' motion, finding, among other things, that: (i) the Defendants were aware of the suit; (ii) their professed ignorance regarding the possibility of default was "disingenuous"; and (iii) their failure to appear and defend was the result of "conscious decision or willfulness." *See* Ex. K (Ruling on Mot. to Reopen) at 4.

37. Having declined to set aside the Defendants' default, the Court proceeded with a damages hearing. *See generally id.*; Ex. N, & O (Damages Hearing Tr. Days 1 & 2).

38. The hearing spanned two days and included the testimony of 10 witnesses. *See generally* Ex. N & Ex. O (Damages Hearing Tr. Days 1 & 2).

6

39. The Defendants were represented by able counsel for the duration of the hearing and testified on their own behalf. *See generally id.*

40. There was evidence in the District Court's record in the Civil Rights Action that since at least March 2009, Parris began to experience problems with her septic tank, including: sewage backing up into her home; sewage rising to the surface both underneath Parris' shome and in her yard; the destruction of her property stored beneath her home; and an unbearable stench in and around her home. *See* Ex. N at 139, 141-49, 152, 226-229; Ex. O at 11-12.

41. Expert testimony established that soil in Parris's yard was contaminated by raw sewage, which is a biohazard. Ex. N at 80-85, 93.

42. At the damages hearing, the Defendants did not dispute that under Parris's lease agreement, the mobile home park that they managed was obligated to keep all utilities in good working condition, to maintain all water and sewer lines, and to effect related emergency repairs within 72 hours. Ex. P (Lease Agreement – Damages Hearing Ex. 508) ¶¶ 5.5–5.7; *see also* Ex. O 2 at 161 (Pappas concedes that maintenance of the septic system was a responsibility of the mobile home park).

43. There was evidence in the District Court's record that when the septic system flooded Parris's lawn or backed up into her home, she would consistently call the Defendants, but they would not take her call and would only respond after three days or more, despite their obligation to act within 72 hours and the availability of 24-hour service from the local septic company. Ex. N at 150-51, 226, 229; Ex. O at 16; *but see* Ex. N at 230 (recounting one occasion in which the system was pumped out within 72 hours).

44. Delaney admitted at the hearing that the septic system needed to be pumped out approximately fourteen times over a two-year period. *See* Ex. O at 124-144.

45. Pappas admitted at the hearing that he knew sewage had backed up into Parris's home. *See id.* at 176.

46. The Defendants admitted that rather than arranging for regularly-scheduled septic pumping or some permanent solution, the Defendants' practice was to wait for complaints from Parris before taking action. *See* Ex. O at 155.

47. There was evidence in the District Court's record that when Parris told Delaney that the smell from the overflowing septic system made Parris violently ill and forced her from her home to a hotel on multiple occasions, Delaney responded, "You'll just have to put up with it. We have 72 hours before we have to send anyone out to pump you out." *See* Ex. N at 143 *see also id.* at 230.

48. On October 26, 2009, when a Department of Health official inquired about complaints Parris made about the septic system, Delaney claimed that the Defendants were in the process of connecting Parris's unit to municipal sewer lines. *See* Ex. Q (Health Dep't Records – Damages Hearing Ex. 501) at 6.

49. Parris's unit would not be connected to sewer lines until 17 months later. *See* Ex. Q (Health Dep't Records – Damages Hearing Ex. 501) at 6; Ex. N at 1 (hearing commenced on March 24, 2011); Ex. O at 41 (sewer lines connected on approximately March 30, 2010).

50. On November 2, 2009, a health official conducted a follow-up site visit. *See* Ex. Q at 6.

51. By a letter dated November 2, 2009, the Defendants' former attorney, Lonardo, threatened to evict Parris. *See* Ex. R (Lonardo Letter dated Nov. 2, 2009 – Damages Hearing Ex. 517).

52. Two weeks before the damages hearing, a Department of Health official conducted another site inspection and discovered sewage overflowing from the septic system onto the ground. *See* Ex. N at 1 (hearing commenced on March 24, 2011); Ex. O at 97, 107-08 (testimony concerning site visit on March 11, 2011); Ex. S, T, & U (inspection log and photographs of sewage on the ground – Damages Hearing Ex. 9, 11 & 12).

53. During that inspection, when a health official directed Delaney to have the system pumped out because overflowing sewage was a health code violation, the Defendants waited three days to do so. *See* Ex. O at 109-111; Ex. V (Email from Dep't of Health – Damages Hearing Ex. 10).

54. The Defendants arranged to have Parris's unit connected to municipal sewer lines after the damages hearing had commenced. *See* Ex. N at 1 (hearing commenced on March 24, 2011); Ex. O at 41 (sewer lines connected on approximately March 30, 2010).

55. Pappas admitted at the hearing that he had worked as a contractor for 30 years and had experience installing and maintaining septic systems. *See* Ex. O at 160-61.

56. Delaney admitted at the hearing that she had destroyed evidence, specifically her notes, regarding problems with the septic system. *See* Ex. N at 1 (hearing commenced on March 24, 2011); Ex. O at 150-51 (notes destroyed on approximately March 14).

57. There was evidence in the District Court's record that in November 2009, Parris informed Lonardo (the Defendants' prior counsel) that she was disabled and required the assistance of a live-in medical aid, and that in response, Lonardo told Parris that neither he, nor the Defendants, believed her. *See* Ex. W (Parris Letter Postmarked Nov. 20, 2009 –Damages Hearing Ex. 504); Ex N at 175, 184, 214; Ex. O at 25.

58. At the hearing, Lonardo admitted that there was no reason to doubt that Parris was disabled. *See* Ex. O at 26.

59. There was evidence in the District Court's record that Parris requested that the Defendants permit her live-in aide to reside with her and provided them with a letter from her physician explaining that this was medically necessary. Through the date of the damages hearing (and through the present), the Defendants never agreed to this accommodation. *See* Ex. N at 137; Ex. B ¶ 43 & Ex. 5 (Dr. Carol Levitt Letter dated Dec. 9, 2009 – Exhibit to Parris Aff.).

60. There was evidence in the District Court's record that the Defendants attempted to use Parris's need for an aide as leverage, threatening to evict her (on the basis of her aid's presence) if she refused to cover the cost of servicing the malfunctioning septic system. *See* Ex. N at 129, 192.

61. The Defendants attempted to evict Parris because of, among other things, the presence of her medically-necessary live-in aide. *See* Ex. A (Ruling on Plaintiff's Mot. for Preliminary Injunction) at 4.

62. The Defendants had access to the advice of Attorney Lonardo, who testified that he had nearly forty years of legal experience and specialized in housing law related to mobile home evictions, collections, and sales. *See* Ex. O at 22-23.

63. Parris's medical records, as well as testimony from her treating physician, her live-in aide, and Parris herself, provided that she suffered from nausea, anxiety, exhaustion, insomnia, and depression, which the District Court found to be the result of the Defendants' conduct. *See* Ex. X, Y, Z & AA (Parris medical records –Damages Hearing Ex. 1, 2, 3 & 4); Ex. N at 28-29, 32, 127, 140-41; Ex. O at 6-9; Ex. AB (Damages Ruling) at 9-10.

64. At the conclusion of the damages hearing, the District Court reserved judgment, but ordered the Defendants to make a disclosure of their assets to Parris and suggested that the Defendants agree not to dissipate any assets. Ex. O at 205-08.

65. Upon Parris's motion, the District Court entered an order providing that: "Defendants will not dissipate any existing assets during the pendency of this action." Ex. G Entry 65 at 8.

66. After the damages hearing, Parris moved for sanctions and prejudgment attachment of the Defendants' assets, claiming that the Defendants had failed to make a complete disclosure of assets and were violating the District Court's non-dissipation order, and at the resultant hearing on that motion, the Defendants appeared, testified, and were represented by counsel. *See generally* Ex. AC ( PJR Hearing Tr.).

67. There was evidence in the District Court's record that the Defendants failed to disclose all assets as ordered by the District Court. *See* Ex. AC at 44-45, 50-52, 86-87.

68. There was evidence in the District Court's record that while under the non-dissipation order, the Defendants were attempting to sell certain of their assets. *Id.* at 45-46.

69. Pappas sold an undisclosed apartment building on the eve of the prejudgment remedy hearing. *See* Ex. AG (Sanctions Hearing Transcript) at 62-64.

70. Certain assets disclosed by the Defendants were the subject of tax auctions. *Id.* at 53.

71. Certain assets disclosed by the Defendants were encumbered by mechanics' liens that had been entered within minutes of each other by two separate companies whose principals had been informed of pendency of the Civil Rights Action by Pappas. *Id.* at 70-74.

72. There was evidence in the District Court record that after the damages hearing, the principal telephone number that Normandies Park tenants used to contact the Defendants was disconnected; stagnant water accumulated on the grounds; and trash collection was inconsistent, which attracted animals to the site. *See* Ex. AD (Parris PJR Aff.) ¶¶ 8-13; Ex. AE (Fredrickson Aff.) ¶¶ 6-8; Ex. AF (Demars Aff.) ¶¶ 7, 9, 11-13.

73. At the conclusion of the prejudgment remedy hearing, the District Court granted Parris a prejudgment remedy in the amount of $300,000 and ordered the Defendants to make a complete disclosure of assets. Ex. AC at 100.

74. On January 4, 2012, the District Court issued its damages ruling (the "Damages Ruling"), which recommended that Parris be awarded $112,407 in compensatory damages and $150,000 in punitive damages. *See generally* Ex. AB (Damages Ruling).

75. On January 4, 2012, the District Court awarded Parris her attorneys' fees in the amount of $87,392.50 (the "First Attorney Fee Award"). *See* Ex. G Entry 113 at 12.

76. Over the Debtor's objections, the District Court (Eginton, D.J.) approved and adopted in full both the Damages Ruling and First Attorney Fee Award, and directed the clerk to enter judgment in Parris's favor. *See id.* Entries 114, 116, 120-21 at 12-13; Ex. AH (Order Adopting Damages Ruling) at 1.

77. Final judgment was rendered on February 10, 2012. Ex. AI (Judgment).

78. In its Damages Ruling, the District Court concluded, among other things, that Parris met her burden of proof as to punitive damages under the Fair Housing Amendments Act. *See* Ex. AB (Damages Ruling) at 22 ("the Court finds that punitive damages are warranted here").

79. In its Damages Ruling the District Court ruled that the "defendants acted willfully, maliciously and/or with reckless disregard for plaintiff's FHA rights when they failed to accommodate her disability." *Id.*

80. The District Court found that "after plaintiff provided proof of her medical disability, defendants continued eviction proceedings until they were ordered by the Court to withdraw the action." *Id.*

81. The District Court found that the "Defendants were dealing with a tenant who had significant health issues and who was vulnerable emotionally and financially. The record reflects they tried to take advantage of her for their own financial benefit." *Id.* at 24-25.

82. The District Court found that the Defendants "inflicted emotional and physical harm" to Parris and that their "conduct toward Ms. Parris was highly reprehensible." *Id* at 22.

83. In awarding punitive damages, the District Court also stated that "despite a court-ordered agreement to refrain from dissipating assets," the Defendants (i) "reduced the value of the disclosed properties by failing to pay taxes"; (ii) listing "properties for sale"; and (iii) "took steps to further encumber the property by incurring expenses for work by outside contractors whom they did not pay, resulting in mechanics liens." Id. at 22-23.

84. In addressing Parris's separate request for damages under CUTPA, the District Court stated that Parris had "established that defendants acted willfully, maliciously and/or with reckless disregard" and further, found that Defendants' conduct was "unfair, offends public policy, and caused injury" to Parris. *Id.* at 29, 27.

85. To avoid a double recovery, the District Court declined to grant an additional award of punitive damages under CUTPA. *Id.* at 29.

86. In the Damages Ruling, the District Court used the he terms "willful" and "intentional" interchangeably. *See* Ex. AB(Damages Ruling) at 18 (describing the requirement of "intentional discrimination" as a prerequisite to a punitive damages award); *id.* at 22 (awarding punitive damages because of proof that Defendants "acted willfully . . . when they failed to accommodate [Parris's] disability").

87. On February 7, 2012, Parris moved to compel the Defendants to comply with asset-related discovery requests. *See* Ex. G Entry 119 at 13.

88. On February 15, 2012, the District Court granted that motion. *See id.* Entry 123 at 13.

89. Parris then moved for sanctions in connection with the Defendants' conduct in post-judgment discovery. *See id.* Entry 138 at 15.

90. On March 27, 2012, the District Court granted that motion, finding "on the record that it was 'clear' defendants had not made a full disclosure and offered no legitimate explanation for failing to follow the Court's order." *See* Ex. AJ (Order on Sanctions Mot.) at 1.

91. The District Court later ordered, among other things, that Parris was "entitled to attorneys' fees not previously awarded that have been incurred in seeking a complete disclosure of assets, in attempting to prevent the dissipation of assets, and in post-judgment discovery." *Id.* at 8.

92. The District Court further ordered that Parris's "counsel shall submit affidavits detailing the time they have spent on or before September 1, 2012. Thereafter, plaintiff's counsel shall submit a Supplemental Motion for Attorneys' Fees and Costs with additional affidavits and time records every six months until collection is complete." *Id.* Before Parris's counsel could comply, the Defendants filed their respective chapter 7 petitions.

Dated: February 1, 2013

                        DONNA PARRIS, PLAINTIFF

                By:   */s/ Michael J. Coolican*
                    Michael J. Coolican [ct28057]
                    Katherine L. Lindsay [ct27971]
                    BRACEWELL & GIULIANI LLP
                    225 Asylum Street, Suite 2600
                    Hartford, CT 06103
                    Tel: (860) 947-9000
                    Fax: (860) 246-3201
                    Email: michael.coolican@bgllp.com
                    Email: katherine.lindsay@bgllp.com

                    Timothy Bennett-Smyth [ct27615]
                    Greg J. Kirschner [ct26888]
                    THE CONNECTICUT FAIR HOUSING CENTER
                    221 Main St., 4th Floor
                    Hartford, CT 06106
                    Tel: (860) 263-0728
                    Fax: (860) 247-4236
                    Email: tsmyth@ctfairhousing.org
                    Email: greg@ctfairhousing.org

                    *Her attorneys*