# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. |
| ROBIN DELANEY, | ) | 12-21924 (ASD) |
| Debtor | ) | |
| | ) | Chapter 7 |
| | ) | |
| DONNA PARRIS, | ) | |
| Plaintiff, | ) | |
| v. | ) | Consolidated |
| ROBIN DELANEY, | ) | Adversary Proceeding |
| Defendant. | ) | No. 12-02078 |
| | ) | |

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| CHARLES PAPPAS, | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| DONNA PARRIS, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| CHARLES PAPPAS, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

BRACEWELL & GIULIANI LLP
225 Asylum Street, Suite 2600
Hartford, CT 06103
Tel: (860) 947-9000
Fax: (860) 246-3201

THE CONNECTICUT FAIR HOUSING CENTER
221 Main St., 4th Floor
Hartford, CT 06106
Tel: (860) 263-0728
Fax: (860) 247-4236

*Attorneys of Plaintiff Donna Parris*

#4240748.6

## I.  <u>INTRODUCTION</u>

Nearly one year ago, the United States District Court for the District of Connecticut entered a final judgment (the "District Court Judgment") against the Defendant-Debtors Charles Pappas and Robin Delaney (collectively, the "Defendants"), finding them liable to Plaintiff-Judgment Creditor Donna Parris for, among other things, violating her rights under the Fair Housing Amendments Act, 42 U.S.C. §§ 3601 *et seq.*   As part of that judgment, the District Court awarded Parris punitive damages, finding that the Defendants had "acted willfully, maliciously and/or with reckless disregard for [Parris's fair housing] rights when they failed to accommodate her disability," specifically, by attempting to evict her from her home because her medically-necessary live-in aide was not listed as a tenant on her lease.  The District Court made this finding after conducting a two-day evidentiary hearing to determine the extent of the harm caused by the Defendants and whether (and to what extent) Parris was entitled to punitive damages.  The Defendants appeared at the hearing, were represented by counsel, and testified on their own behalf.

Parris now moves for summary judgment, seeking this Court's determination that the Defendants' debts to Parris arising from the District Court Judgment are not subject to discharge under Bankruptcy Code Section 523(a)(6), because such debts are "for willful and malicious injury by [the Defendants] to [Parris]."  There can be no genuine dispute that the Defendants had a full and fair opportunity before the District Court to litigate whether they willfully and maliciously injured Parris.  Nor can it be disputed that the District Court decided that question conclusively in Parris's favor.  Accordingly, the Defendants are collaterally estopped from revisiting this issue before the Bankruptcy Court.  The Defendants are bound by the District

Court's prior determination that they willfully and maliciously injured Parris, and thus, their debts to Parris are not dischargeable in bankruptcy, as a matter of law.

In light of the foregoing, Parris requests that the Court grant her motion and enter a judgment that all sums owed to Parris by the Defendants are non-dischargeable under Section 523(a)(6).[1]

## II.    FACTS

The plaintiff, Donna Parris, is a person with a disability as a result of her diabetes mellitus, retinopathy, generalized sensory-motor polyneuropathy, bilateral ulnar neuropathy, and orthostatic hyptension.  *See* Ex. A (Ruling on Plaintiff's Mot. for Preliminary Injunction) at 1-2; Ex. B (Parris Aff.) ¶ 5-6.  Parris's disabilities cause frequent drops in blood pressure that lead to her loss of consciousness, vision problems, significant nerve damage in her extremities, and chronic pain.  *See* Ex. A at 2; Ex. B ¶ 7.  As documented by her physician, Parris requires a 24-hour live-in aide to manage her disabilities.  *See* Ex. A at 2; Ex. B ¶ 43.

Parris owns her residence, a mobile home situated on a lot in a mobile home park in Dayville, Connecticut.  *See id.* ¶¶ 2-3.  She rents that lot from the Defendants, who own and manage the park through two wholly-owned limited liability companies, Normandies Park LLC and Anna Alexis LLC.  *See id.* ¶¶ 4.

Parris is a judgment-creditor of both Defendants.  *See* Ex. C (Delaney Petition Sched. D) at 1; Ex. D (Delaney Petition Sched. F) at 4; Ex. E (Pappas Petition Sched. D) at 2; Ex. F (Pappas Petition Sched. F) at 3.  The Defendants acknowledge the existence of the judgment-

---

[1] This is a consolidated proceeding, and as such, there are separate complaints naming Delaney and Pappas as defendants.  Both complaints seek a determination of non-dischargeablity under Section 523(a)(6), but the complaint against Pappas also alleges non-dischargeability under Section 727(a)(2).  *See Parris v. Pappas*, 12-02081, Compl. ¶¶ 26-28 (Docket Entry 1).  The instant motion seeks a determination of non-dischargeability under Section 523(a)(6).  Parris does not presently seek a determination of non-dischargeability under Section 727(a)(2).

debt in their respective Chapter 7 petitions.   Indeed, according to their schedules, the debt is

neither contingent nor even in dispute.   *See* Ex. C at 1; Ex. D at 4; Ex. E at 2; Ex. F at 3.   The

judgment-debt arose from a civil rights action (the "Civil Rights Action") filed by Parris against

the Defendants in the United States District Court for the District of Connecticut, captioned

*Parris v. Pappas*, et al., 3:10CV1128(WWE).   *See* Ex. G (Civil Rights Action Docket) at 1-2; *id.*

entry 122 at 13 (identifying Parris and the Defendants as parties and entry of judgment).[2]

## A.   The Civil Rights Complaint

The complaint in the Civil Rights Action (the "Civil Rights Complaint") named as

defendants both Pappas and Delaney, as well as their two limited liability companies.   *See*

*generally* Ex. H (Civil Rights Complaint).   In brief, the Civil Rights Complaint alleged that the

Defendants failed to maintain the septic system connected to Parris's mobile home as required

under the relevant lease.   *See id.*   ¶¶ 9, 15-16.   The septic system failed on multiple occasions,

causing sewage to flood Parris's lawn and back-up into her home.   *Id.* ¶¶ 15-16.   When the

Defendants declined to effect a permanent repair, Parris sought the assistance of local health

officials and eventually, the Connecticut Department of Consumer Protection.   *Id.* ¶¶ 19, 23-24.

The Defendants retaliated by threatening to evict Parris from the mobile home park on

the grounds that, among other things, an "unauthorized tenant" resided in her home.   *Id.* ¶¶ 25-

26.   In response, Parris explained that she was disabled and that the so-called unauthorized tenant

---

[2] Much of the procedural history of the Civil Rights Action is matter-of-factly pleaded in the
complaints filed in the instant consolidated adversary proceeding.   *See generally* Compl. in
*Parris v. Delaney*, 12-2078 (Bankr. D. Conn.); *Parris v. Pappas*, 12-2081 (Bankr. D. Conn.).   In
their answers to those complaints, despite the fact that both Defendants were parties to, and
active participants in, the Civil Rights Action, the Defendants now deny basic facts or aver that
they have "insufficient knowledge and/or information upon which to form an opinion or belief"
regarding the truth of Parris's recitation of the procedural history of the Civil Rights Action.   *See
generally* Answer in *Parris v. Delaney*, 12-2078 (D. Conn. Bankr.) & Answer in *Parris v.
Pappas*, 12-2081 (D. Conn. Bankr.).   Parris reserves her right to seek sanctions in connection
with the Defendants' answers, which appear designed to unnecessarily protract this litigation.

was her medically-required live-in aide. *Id.* ¶ 28.  Moreover, she provided documentation from her physician of her disability and need for a live-in aide, and requested whatever forms were necessary to certify the lawful tenancy of her aide as a reasonable accommodation of her disability. *Id.* ¶¶ 29-30.  The Defendants declined to grant this accommodation. *Id.* ¶ 29. Instead, the next time Parris contacted local officials about the persistent problems with her septic system, the Defendants' counsel contacted her with an ultimatum: either Parris agree to pay $300 each time the septic system required servicing or the Defendants would evict Parris and her aide. *Id.* ¶¶ 33-34.  Parris refused the Defendants' demand and they promptly initiated an eviction action against her and the aide, again asserting that her aide was an unauthorized tenant and that his presence violated Parris's lease of the lot at the mobile home park. *Id.* ¶¶ 35-36.

The Civil Rights Complaint asserted five counts: (i) violations of the Fair Housing Amendments Act, 42 U.S.C. §§ 3601 *et seq.*; (ii) violations of Connecticut's Human Rights Act, Conn. Gen. Stat. § 46a-64c; (iii) breach of contract; (iv) breach of the implied covenant of good faith and fair dealing; and (v) violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110b *et seq.  See generally id.*[3]

## B. <u>Defendants Are Warned Of The Possibility Of Default But Still Fail To Appear</u>

The Civil Rights Complaint was filed on July 20, 2010, and upon filing, Parris's counsel mailed the Defendants copies of the summons, complaint, and a request to waive formal service. *See* Ex. G Entry 1 at 3; Ex. I (Bennett-Smyth Aff.) ¶ 5.  On August 3, 2010, Attorney Thomas Lonardo (the Defendants' attorney in the eviction action against Parris) informed the Defendants

---

[3] Under both the Fair Housing Amendments Act and Connecticut's Human Rights Act, it is unlawful to discriminate in housing matters on the basis of a disability, which includes any "refusal to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford [an] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B); *accord* Conn. Gen. Stat. § 46a-64c(a)(6)(C).

in writing that he would not represent them in the Civil Rights Action without a substantial retainer and warned them of the danger of default if they were slow to respond. *See* Ex. J (Lonardo Letter dated Aug. 3, 2010). On August 18, 2010, Lonardo contacted Parris's counsel and offered to settle the Civil Rights Action. *See* Ex. K (Ruling on Mot. to Reopen) at 2; Ex. I ¶¶ 7-8. After exchanging offers, the parties were unable to come to an agreement. *See* Ex. L (Lonardo Letter dated Sept. 8, 2010).

On September 8, 2010, given that the Civil Rights Action had not been settled, Attorney Lonardo warned the Defendants (again in writing) that they should obtain representation because a judgment against them could result in a substantial award in Parris's favor. *See id.* On that same day, Lonardo confirmed for Parris's counsel that he would not be representing the Defendants in the Civil Rights Action. *See* Ex. K at 2; Ex. I ¶ 9.

Thereafter, Parris's counsel emailed the Defendants to inquire again whether they would agree to waive formal service of the Civil Rights Complaint; the Defendants never responded. *See id.* ¶¶ 11-12; Ex. K at 2. When Parris subsequently sought to serve the Defendants formally with the summons and complaint, the Defendants attempted to evade service. *Id.* at 4.[4] After the Defendants were successfully served, they declined to appear and defend. *Id.* at 2.

---

[4] The Defendants attempt to evade service of process in the Civil Rights Action was detailed in the process server's sworn proof of service, *see* Ex. M (Returned Summons & Certificate of Service) at 2, which states:

> I arrived and knocked at the provided location of 241 Church Street, Brooklyn, CT. No one came to the door; however, I could hear people inside the home. I knocked again, and a child looked out the window to see who was there. I heard the child yell out, "Charlie! That serving guy is back!" Approximately 30 seconds later, the same 13 year old child answered the door. I asked if Charles was there, and he responded, "No." I then asked if his mother was there, and he stated, "No." I knew he was lying as I heard him speak to whom I believe was Charles Pappis [*sic*] when he warned him of my arrival. I also heard a female in the house. The home is about 400 feet off the road, so I left the property and

5

Accordingly, on November 19, 2010, the clerk entered the Defendants' default, and on December 2, 2010, the District Court rendered a default judgment in Parris's favor.  *Id.* at 2. Thereafter, the District Court scheduled a damages hearing and enjoined the Defendants from evicting Parris from her home.  *See* Ex. G Entry 21 at 4; Ex. A at 4.

### C.  <u>**The Court Finds The Defendants Consciously Decided Not To Appear And Defend.**</u>

In the interim, on December 13, 2010, new counsel appeared on the Defendants' behalf and thereafter moved to set aside the default judgment.  *See* Ex. G Entries 25, 27 at 5.  The District Court denied the Defendants' motion, finding, among other things, that: (i) the Defendants were aware of the suit; (ii) their professed ignorance regarding the possibility of default was "disingenuous"; and (iii) their failure to appear and defend was the result of "conscious decision or willfulness."  *See* Ex. K (Ruling on Mot. to Reopen) at 4.

### D.  <u>**The Damages Hearing**</u>

Having declined to set aside the Defendants' default, the Court proceeded with a damages hearing.[5]  The hearing spanned two days and included the testimony of 10 witnesses.  *See generally* Ex. N & Ex. O (Damages Hearing Tr. Days 1 & 2).  The Defendants were represented

---

called my office.  I spoke with our office manager who advised me to knock again and abode the papers to the son.  As I pulled in the driveway, I realized the electric gate at the end of the driveway had been closed behind me.  While on the property, I observed a black Lexus with CT plates 170WFN, that I recognized as Robin Delany's car from previous interactions.  There was also a white pickup in the driveway.

10/18/10 @ 7:27 PM the house had a few lights on inside and the fireplace was going.  There was a white Ford truck with CT plates K40311.  I knocked on the door several times with no answer.  At this time.  I left the papers abode.

[5] Under the federal rules, a party's default is deemed to constitute a concession of all well-pleaded allegations of liability. *E.g. Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).  A default, however, "is not considered an admission of damages." *Id.* at 158.  Likewise, a defendant's default, standing alone, does not entitle a plaintiff to an award of punitive damages.  *See Flaks v. Koegel*, 504 F.2d 702, 706-07 (2d Cir. 1974).

by able counsel for the duration of the hearing and testified on their own behalf.  *See generally*

*id.*

At the conclusion of the damages hearing, there was substantial evidence in the record

that Parris was entitled to an award of punitive damages – that is, evidence that the Defendants

were *willful* and *malicious* in their conduct.  Specifically:

- Since at least March 2009, Parris began to experience problems with her septic tank, including: sewage backing up into her home; sewage rising to the surface both underneath Parris's home and in her yard; the destruction of her property stored beneath her home; and an unbearable stench in and around her home. *See* Ex. N at 139, 141-49, 152, 226-229; Ex. O at 11-12.

- Expert testimony established that soil in Parris's yard was contaminated by raw sewage, an obvious biohazard.  Ex. N at 80-85, 93.

- At the hearing, the Defendants did not dispute that under Parris's lease agreement, the mobile home park that they managed was obligated to keep all utilities in good working condition, to maintain all water and sewer lines, and to effect related emergency repairs within 72 hours.  Ex. P (Lease Agreement – Damages Hearing Ex. 508) ¶¶ 5.5–5.7; *see also* Ex. O 2 at 161 (Pappas concedes that maintenance of the septic system was a responsibility of the mobile home park).

- When the septic system flooded Parris's lawn or backed up into her home, she would consistently call the Defendants, but they would not take her call and would only respond after three days or more, despite their obligation to act within 72 hours and the availability of 24-hour service from the local septic company.  Ex. N at 150-51, 226, 229; Ex. O at 16; *but see* Ex. N at 230 (recounting one occasion in which the system was pumped out within 72 hours).

- In this regard, the Defendants admitted at the hearing that the septic system needed to be pumped out approximately fourteen times over a two-year period and that they knew sewage had backed up into Parris's home.  *See* Ex. O at 124-144, 176.

- They further admitted that rather than arranging for regularly-scheduled septic pumping or some permanent solution, the Defendants' practice was to wait for complaints from Parris before taking action.  *See* Ex. O at 155.

- When Parris told Delaney that the smell from the overflowing septic system made Parris violently ill and forced her from her home to a hotel on multiple occasions, Delaney responded, "You'll just have to put up with it.  We have 72 hours before we have to send anyone out to pump you out."  *See* Ex. N at 143 *see also id.* at 230.

7

- On October 26, 2009, when Department of Health officials inquired about complaints Parris made about the septic system, Delaney claimed that the Defendants were in the process of connecting Parris's unit to municipal sewer lines – in fact, the unit would not be connected to sewer lines for another 17 months.  *See* Ex. Q (Health Dep't Records – Damages Hearing Ex. 501) at 6; Ex. N at 1 (hearing commenced on March 24, 2011); Ex. O at 41 (sewer lines connected on approximately March 30, 2010).

- On November 2, 2009, health officials conducted a follow-up site visit; by a letter of that same date, the Defendants' former attorney, Lonardo, threatened to evict Parris.  *See* Ex. Q at 6; Ex. R (Lonardo Letter dated Nov. 2, 2009 – Damages Hearing Ex. 517).

- Problems with the septic system persisted for years – just two weeks before the damages hearing, Department of Health officials conducted another site inspection and discovered sewage overflowing from the septic system onto the ground.  *See* Ex. N at 1 (hearing commenced on March 24, 2011); Ex. O at 97, 107-08 (testimony concerning site visit on March 11, 2011); Exs. S, T, & U (inspection log and photographs of sewage on the ground – Damages Hearing Exs. 9, 11 & 12).

- On that occasion, when health officials directed Delaney to have the system pumped out because overflowing sewage was a health code violation, the Defendants waited three days to do so.  *See* Ex. O at 109-111; Ex. V (Email from Dep't of Health – Damages Hearing Ex. 10).

- The Defendants eventually arranged to have Parris's unit connected to municipal sewer lines, but only after the damages hearing had commenced.  *See* Ex. N at 1 (hearing commenced on March 24, 2011); Ex. O at 41 (sewer lines connected on approximately March 30, 2010).

- The Defendants permitted the problems with the septic system to drag on for two years despite their own abilities to resolve the situation.  In this regard, Pappas admitted that he had worked as a contractor for 30 years and had experience installing and maintaining septic systems.  *See* Ex. O at 160-61.

- The Defendants admitted that they had destroyed evidence of Parris's problems with the septic system.  Specifically, in the weeks before the damages hearing commenced, Delaney destroyed her notes regarding when the septic system was serviced.  *See* Ex. N at 1 (hearing commenced on March 24, 2011); Ex. O at 150-51 (notes destroyed on approximately March 14).

- In November 2009, Parris informed Lonardo (the Defendants' prior counsel) that she was disabled and required the assistance of a live-in medical aid, and in response, Lonardo told Parris that neither he, nor the Defendants, believed her.  *See* Ex. W (Parris Letter Postmarked Nov. 20, 2009 –Damages Hearing Ex. 504); Ex N at 175, 184, 214; Ex. O at 25.

- At the hearing, Lonardo admitted that there was no reason to doubt that Parris was disabled.  *See* Ex. O at 26.

8

- Parris in turn requested that the Defendants permit her live-in aide to reside with her and provided them with a letter from her physician explaining that this was medically necessary.  Through the date of the damages hearing (and indeed through the present), the Defendants never agreed to this accommodation.  *See* Ex. N at 137; Ex. B ¶ 43 & Ex. 5 (Dr. Carol Levitt Letter dated Dec. 9, 2009 – Exhibit to Parris Aff.).

- Not only did the Defendants refuse Parris this accommodation, they attempted to use her need for an aide as leverage, threatening to evict her (on the basis of her aid's presence) if she refused to cover the cost of servicing the malfunctioning septic system.  *See* Ex. N at 129, 192.

- In fact, the Defendants eventually attempted to evict Parris because of, among other things, the presence of her medically-necessary live-in aide.  *See* Ex. A (Ruling on Plaintiff's Mot. for Preliminary Injunction) at 4.

- Throughout these events, the Defendants had access to the advice of Attorney Lonardo, who testified that he had nearly forty years of legal experience and specialized in housing law related to mobile home evictions, collections, and sales.  *See* Ex. O at 22-23.

- Parris's medical records, as well as corroborating testimony from her treating physician, her live-in aide, and Parris herself, established that she suffered from nausea, anxiety, exhaustion, insomnia, and depression, which the District Court found to be the result of the Defendants' conduct.  *See* Exs. X, Y, Z & AA (Parris medical records –Damages Hearing Ex. 1, 2, 3 & 4); Ex. N at 28-29, 32, 127, 140-41; Ex. O at 6-9; Ex. AB (Damages Ruling) at 9-10.

### E.  The Defendants' Post-Hearing Dissipation of Assets

At the conclusion of the hearing, the District Court reserved judgment, but ordered the Defendants to make a disclosure of their assets to Parris and suggested that the Defendants agree not to dissipate any assets.  Ex. O at 205-08.  Upon Parris's motion, the District Court subsequently made an order to that effect, specifically: "Defendants will not dissipate any existing assets during the pendency of this action."  Ex. G Entry 65 at 8.

When it became apparent to Parris that the Defendants had failed to make a complete disclosure of assets and were violating the District Court's non-dissipation order, Parris moved for sanctions and prejudgment attachment of their assets.  At the resultant hearing on that motion, the Defendants appeared, testified and were represented by counsel.  *See generally* Ex.

9

AC ( PJR Hearing Tr.).  At that time, the District Court received additional evidence relevant to

its impending punitive damages ruling (and the current inquiry).  For example:

- The Defendants failed to disclose all assets.  *See* Ex. AC at 44-45, 50-52, 86-87.

- While under the non-dissipation order, the Defendants were attempting to sell certain of their assets.  *Id.* at 45-46.[6]

- Certain assets disclosed by the Defendants were the subject of tax auctions.  *Id.* at 53.

- Certain assets were encumbered by mechanics' liens that had been entered within minutes of each other by two separate companies whose principals had been tipped off as to the pendency of the Civil Rights Action by Pappas.  *Id.* at 70-74.

- After the damages hearing, the Defendants permitted conditions at the park to deteriorate. Specifically, the principal telephone number that tenants used to contact the Defendants was disconnected; stagnant water accumulated on the grounds; and trash collection was inconsistent, which attracted animals to the site.  *See* Ex. AD (Parris PJR Aff.) ¶¶ 8-13; Ex. AE (Fredrickson Aff.) ¶¶ 6-8; Ex. AF (Demars Aff.) ¶¶ 7, 9, 11-13.

At the conclusion of the hearing, the District Court granted Parris a prejudgment remedy

in the amount of $300,000 and ordered the Defendants to make a complete disclosure of assets.

Ex. AC at 100.

### F.  <u>The Court Finds That The Defendants Willfully And Maliciously Injured Parris</u>

On January 4, 2012, the District Court (Fitzsimmons, M.J.) issued its damages ruling (the

"Damages Ruling"), which recommended that Parris be awarded $112,407 in compensatory

damages and $150,000 in punitive damages.  *See generally* Ex. AB (Damages Ruling).  On that

same day, the District Court awarded Parris her attorneys' fees in the amount of $87,392.50 (the

"First Attorney Fee Award").  *See* Ex. G Entry 113 at 12.  Subsequently, over the Debtor's

objections, the District Court (Eginton, D.J.) approved and adopted in full both the Damages

---

[6] Parris later confirmed that Pappas successfully sold an undisclosed apartment building on the eve of the prejudgment remedy hearing.  *See* Ex. AG (Sanctions Hearing Transcript) at 62-64.

Ruling and First Attorney Fee Award, and directed the clerk to enter judgment in Parris's favor. *See id.* Entries 114, 116, 120-21 at 12-13; Ex. AH (Order Adopting Damages Ruling) at 1.[7]

In its Damages Ruling, the District Court concluded, among other things, that Parris met her burden of proof as to punitive damages under the Fair Housing Amendments Act. *See* Ex. AB (Damages Ruling) at 22 ("the Court finds that punitive damages are warranted here"). The District Court ruled that the "defendants acted willfully, maliciously and/or with reckless disregard for plaintiff's FHA rights when they failed to accommodate her disability." *Id.* Specifically, the District Court found that "after plaintiff provided proof of her medical disability, defendants continued eviction proceedings until they were ordered by the Court to withdraw the action." *Id.* Put another way, the "Defendants were dealing with a tenant who had significant health issues and who was vulnerable emotionally and financially. The record reflects they tried to take advantage of her for their own financial benefit." *Id.* at 24-25. The District Court found that the Defendants "inflicted emotional and physical harm" to Parris and that their "conduct toward Ms. Parris was highly reprehensible." *Id* at 22.[8]

In addressing Parris's separate request for damages under CUTPA, the District Court reiterated that Parris had "established that defendants acted willfully, maliciously and/or with reckless disregard" and further, found that Defendants' conduct was "unfair, offends public policy, and caused injury" to Parris. *Id.* at 29, 27. In the end, however, to avoid a double

---

[7] Final judgment was rendered on February 10, 2012. Ex. AI (Judgment).

[8] In awarding punitive damages, the District Court also emphasized that "despite a court-ordered agreement to refrain from dissipating assets," the Defendants (i) "reduced the value of the disclosed properties by failing to pay taxes"; (ii) listing "properties for sale"; and (iii) "took steps to further encumber the property by incurring expenses for work by outside contractors whom they did not pay, resulting in mechanics liens." *Id.* at 22-23.

recovery, the court declined to grant an additional award of punitive damages under CUTPA. *Id.* at 29.

### G. The District Court Sanctions The Defendants

On February 7, 2012, Parris moved to compel the Defendants to comply with asset-related discovery requests. *See* Ex. G Entry 119 at 13. On February 15, 2012, the District Court granted that motion. *See id.* Entry 123 at 13. Parris then moved for sanctions in connection with the Defendants' conduct in post-judgment discovery. *See id.* Entry 138 at 15. On March 27, 2012, the District Court granted that motion, finding "on the record that it was 'clear' defendants had not made a full disclosure and offered no legitimate explanation for failing to follow the Court's order." *See* Ex. AJ (Order on Sanctions Mot.) at 1. Thereafter, the Court ordered, among other things, that Parris was "entitled to attorneys' fees not previously awarded that have been incurred in seeking a complete disclosure of assets, in attempting to prevent the dissipation of assets, and in post-judgment discovery." *Id.* at 8. The District Court further ordered that Parris's "counsel shall submit affidavits detailing the time they have spent on or before September 1, 2012. Thereafter, plaintiff's counsel shall submit a Supplemental Motion for Attorneys' Fees and Costs with additional affidavits and time records every six months until collection is complete." *Id.* Before Parris's counsel could comply, the Defendants filed their respective Chapter 7 petitions.

### III.   ARGUMENT

The Defendants' debts to Parris arising out the Civil Rights Action are not subject to discharge. Under the Bankruptcy Code Section 523(a)(6), debts "for willful and malicious injury" are non-dischargeable, and it is beyond dispute that the District Court found that the Defendants were willful and malicious in their injurious conduct toward Parris. It is likewise

#4240748.6

beyond dispute that – notwithstanding the Defendants' initial decision not to appear in the Civil Rights Action – the Defendants eventually did appear and participated fully in the District Court's determination that their conduct was willful and malicious. Under such circumstances, the Defendants are collaterally estopped as a matter of law from disclaiming the District Court's prior ruling. This Court is therefore free to apply, and should apply, that ruling to summarily hold that the Defendants' debts to Parris are not dischargeable.[9]

### A.  Standard For Non-Dischargeability Under Section 523(a)(6)

Section 523(a) of the Bankruptcy Code sets forth various exceptions to discharge otherwise available to Chapter 7 debtors. Section 523(a)(6) specifically excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." For purposes of this section, "willful" refers to a deliberate or intentional injury, not a deliberate or intentional act that leads to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *Automated Salvage Transp. Co. v. Swirsky (In re Swirsky)*, 372 B.R. 551, 563 (Bankr. D. Conn. 2006). The Second Circuit has interpreted "malicious," as used in Section 523(a)(6), to mean "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Fin'l Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87-88 (2d Cir. 1996). Malice may be constructive or implied, and implied malice may be demonstrated by the debtor's acts and conduct in the context of the surrounding circumstances. *Id.*

The District Court Judgment plainly demonstrates that: (1) the Defendants deliberately and intentionally violated Parris's rights; and (2) the Defendants acted maliciously. *See Sanger v. Busch (In re Busch)*, 311 B.R. 657, 666 (Bankr. N.D.N.Y. 2004). The doctrine of collateral estoppel precludes the Defendants from revisiting these previously resolved issues.

---

[9] The Court may "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), as incorporated by Fed. R. Bankr. P. 7056.

**B. Non-Dischargeability Under Section 523(a) Can Be Established By Operation Of Collateral Estoppel**

The Supreme Court has held that collateral estoppel is available to litigants in dischargeability proceedings under Bankruptcy Code Section 523(a). *Grogan v. Garner*, 498 U.S. 279, 285 n.11 (1991). The doctrine of collateral estoppel "is an embodiment of the precept of federal common-law that a right, question, or fact distinctly put in issue and directly determined by a court of competent jurisdiction cannot be disputed in a subsequent suit between the same parties or their privies." *Fed. Trade Comm'n v. Wright (In re Wright)*, 187 B.R. 826, 831 (Bankr. D. Conn. 1995) (citation omitted).

Since the Supreme Court's holding in *Grogan*, numerous courts have applied or considered the doctrine when determining whether a claim is dischargeable, specifically under Section 523(a)(6). *See, e.g.*, *Swirsky*, 372 B.R. at 562; *Yash Raj Films v. Ahmed (In re Ahmed)*, 359 B.R. 34, 39 (Bankr. E.D.N.Y. 2005); *Busch*, 311 B.R. at 669.

**C. Collateral Estoppel Bars The Defendants From Re-Litigating In This Court The Findings and Conclusions of the District Court in the Civil Rights Action**

Bankruptcy courts considering whether a prior federal court judgment has preclusive effect apply the federal common law of collateral estoppel. *See Wright*, 187 B.R. at 832. In *Wright*, this Court followed the Supreme Court ruling in *Grogan* and adopted the general rule of collateral estoppel articulated in the Restatement (Second) of Judgments. *Id.* The Restatement (Second) of Judgments provides that: "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." RESTATEMENT (2D) OF JUDGMENTS § 27. As the *Wright* court recognized, this formulation can be reduced to a multi-part test, under which collateral estoppel applies when:

14

1. the issues sought to be precluded are identical to those involved in the prior action;

2. the issues' determination in the prior action was essential to the prior judgment;

3. the issues were determined by a valid and final judgment; and

4. the issues were actually litigated in the prior action.

*Id.*; *see also Nestorio v. Assocs. Commercial Corp. (In re Nestorio)*, 250 B.R. 50, 55 (D. Md. 2000) (applying the same test in a Section 523(a)(6) dischargeability case).

In the present case, each prong of this test is clearly met, and therefore, the District Court Judgment should be given preclusive effect in the present proceeding.

### 1.   The Issue Of Whether the Defendants Caused A "Willful and Malicious Injury" Is Indistinguishable From The Issues Resolved in the Civil Rights Action

The first prong of the collateral estoppel test (whether the issues sought to be precluded are identical to those involved in the prior action) is readily satisfied.  The issue of whether the Defendants engaged in "intentional" discrimination and did so with "malice" (so as to render them liable for punitive damages) is identical to whether the Defendants caused a "willful and malicious" injury to Parris (so as to render their debts nondischargeable).  It is well recognized that when an issue in a prior action closely mirrors an issue in a second action, the identity of issues is sufficient for collateral estoppel purposes.  *See NBA Props. Inc. v. Moir (In re Moir)*, 291 BR 887, 891-92 (Bankr. S.D. Ga. 2003) (concluding award of punitive damages in prior action required a "wrongful act, done intentionally," which was deemed identical to the willful and malicious requirement of Section 523(a)(6)); *accord Nestorio*, 250 B.R. at 58 (concluding prior punitive damages award based on debtor's "malice and deliberate intent" had preclusive effect as to the "willful and malicious injury" requirement under Section 523(a)(6)).

As noted above, for purposes of Section 523(a)(6), "willful" refers to a deliberate or intentional injury.  *See Kawaauhau*, 523 U.S. at 61.  And as noted by the District Court's

15

Damages Ruling, for purposes of the Fair Housing Amendments Act ("FHA"), punitive damage are *only* available in "'cases in which the defendant has engaged in intentional discrimination.'" Ex. AB (Damages Ruling) at 18 (quoting *United States v. Space Hunters, Inc.*, 429 F.3d 416, 427 (2d Cir. 2005)).   There is no discernible distinction between the issues of: (i) whether the Defendants caused a "willful . . . injury" to Parris by violating her fair housing rights; and (ii) whether they engaged in "intentional discrimination" against Parris by violating those same rights.   The issues are identical.   The terms "willful" and "intentional" are plainly synonymous. Indeed, the District Court used them interchangeably.   *See* Ex. AB(Damages Ruling) at 18 (describing the requirement of "intentional discrimination" as a prerequisite to a punitive damages award); *id.* at 22 (awarding punitive damages because of proof that Defendants "acted willfully . . . when they failed to accommodate [Parris's] disability").

The same result is reached when one examines the "malicious" element under Section 523(a)(6).   In that context,  "malicious" means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will."   *Stelluti*, 94 F.3d at 87-88.   Again, under the FHA, to be entitled to punitive damages, a plaintiff must show "intentional discrimination." *Space Hunters*, 429 F.3d at 427.   Intentional discrimination against a person with disabilities is an inherently "wrongful" act that alone should suffice to establish a "malicious injury" for the purposes of Section 523(a)(6).   Moreover, a plaintiff seeking punitive damages in FHA matters must make an *additional* showing above and beyond demonstrating intentional conduct – specifically, it must be shown that the defendant acted with "malice or reckless indifference to the federally protected rights."   *Space Hunters*, 429 F.3d at 427.   In this regard, a "plaintiff may establish the requisite state of mind for an award of punitive damages with evidence (1) that the defendant discriminated in the face of a perceived risk that its actions violated federal law or (2)

16

of egregious or outrageous acts that may serve as evidence supporting an inference of the requisite 'evil motive.'" *Id.* (citations omitted).  Where, as here, a disabled plaintiff is awarded punitive damages upon proof that defendant intentionally discriminated against her (1) knowing that such discrimination is likely illegal or (2) while engaging in acts evincing an "evil motive", that plaintiff has necessarily shown the defendants did something "wrongful and without just cause or excuse" for the purpose of establishing "malicious" conduct under Section 523(a)(6).

This notion is amply demonstrated by the District Court's findings in the Civil Rights Action.   As a necessary part of its punitive damages analysis and determination that the Defendants "acted willfully, maliciously and/or with reckless disregard for [Parris's] FHA rights," the District Court found that: (i) the Defendants' "conduct toward Ms. Parris was highly reprehensible;" (ii) "after [Parris] provided proof of her medical disability, defendants continued eviction proceedings until they were ordered by the Court to withdraw the action"; (iii) "Defendants were dealing with a tenant who had significant health issues and who was vulnerable emotionally and financially"; (iv) the Defendants "tried to take advantage of [Parris] for their own financial benefit"; (v) they "inflicted emotional and physical harm" on Parris; (vi) with respect to assets preserved by a court order to satisfy Parris's claims, the Defendants "reduced the value of the disclosed properties by failing to pay taxes"; (vii) they listed certain "properties for sale"; and (viii) they "took steps to further encumber the property by incurring expenses for work by outside contractors whom they did not pay, resulting in mechanics liens." Ex. AB (Damages Ruling) at 22-25.  These basic findings by the District Court directly address and conclusively resolve the salient question under Section 523(a)(6): whether the Defendants caused a "willful and malicious injury" to Parris.   According to the facts found by the District Court, they did.

Both in the abstract and as applied in the Civil Rights Action, the "intentional discrimination" and "malice/reckless disregard" requirements for awarding punitive damages under the FHA are indistinguishable from the "willful" and "malicious" requirements under Section 523(a)(6). Accordingly, the first prong of the test for the application of collateral estoppel is satisfied. *See Wright*, 187 B.R. at 832

### 2. The Issue of Whether the Defendants "Intentionally Discriminated" Against Parris With "Malice or Reckless Disregard" For Her Rights Was Essential To The Prior Judgment In The Civil Rights Action

The second prong of the collateral estoppel test is satisfied as well. Specifically, it was essential to the District Court Judgment that the court determine whether the Defendants intentionally discriminated against Parris with malice or reckless disregard of her fair housing rights; and it was essential that the District Court find those facts necessary to resolve that question. Again, punitive damages could not have been awarded in the Civil Rights Action under the FHA unless the District Court resolved those issues and made such findings. *See Space Hunters*, 429 F.3d at 427 (articulating the prerequisites for an award of punitive damages); *Littlefield v. McGuffey (In re McGuffy)*, 145 B.R. 582, 589-90 (Bankr. N.D. Il. 1992) (holding that plaintiff could not have prevailed on her fair housing act claims in the prior action unless the jury was convinced the defendant's racial discrimination against her was willful and that, in order to award punitive damages, the jury must have found the defendant exhibited actual or constructive malice).

### 3. The Prior Judgment In The Civil Rights Action Is Valid And Final

Parris also satisfies the third prong of the collateral estoppel test (as articulated by the *Wright* court): whether "the issues were determined by a valid and final judgment." *Wright*, 187 B.R. at 832. There is no dispute that the District Court Judgment is legally valid and final. While it is true that the Defendants have appealed that judgment, their ability to take an appeal

18

only demonstrates that the judgment is final.  And in any event, for collateral estoppel purposes, the pendency of an appeal does not detract from a judgment's decisiveness or finality, unless and until it is reversed.  18A Charles Alan Wright & Arthur R. Miller, FED. PRAC. & PROC. JURIS. § 4443 (2d ed.); *see also Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 189 (1941); *Garner v. NGC Bodily Injury Trust*, No. 11-CV-6567, 2012 WL 3560816 *4 (W.D.N.Y. Aug. 16, 2012); *see also United States v. Int'l Broth. Of Teamsters*, 905 F.2d 610 620-21 (2d Cir. 1990) (holding that pendency of criminal appeal generally does not deprive a judgment of its preclusive effect).

### 4.    The Issue of Whether Parris Was Entitled To Punitive Damages Because The Defendants "Intentionally Discriminated" Against Her With "Malice or Reckless Disregard" For Her Rights Was Actually Litigated

Finally, Parris also satisfies the fourth prong of the collateral estoppel test: whether "the issues were actually litigated in the prior action."  *Wright*, 187 B.R. at 832.  Whether cast as "willful and malicious" or "intentional and with malice and/or reckless disregard," these issues were actually litigated and resolved in Parris's favor.

Nevertheless, both Defendants' answers have asserted the following as an "affirmative" defense:  "Plaintiff cannot rely upon any collateral estoppel with respect to the issues of liability found by the District Court, specifically that the Defendant acted willfully, maliciously and with reckless disregard for Parris's civil rights, because those issues were not actually litigated in the District Court."  Pappas Ans. at 3; Delaney Ans. at 2.  It appears the Defendants intend to argue that their liability to Parris was never litigated but instead was established by default and thus collateral estoppel does not apply.   This notion is without legal or factual support and should be rejected by this Court.

19

### a. The Defendants' Default Did Not Relieve Parris Of Her Burden To Demonstrate An Entitlement To Punitive Damages.

As a matter of law, liability for *punitive* damages is *not* established by a defendant's default, as a default does not relieve a plaintiff of his or her burden to show – in the first instance – that the defendant's conduct merits a punitive damages award. *See Flaks*, 504 F.2d at 706-07 (vacating punitive damages award entered without a hearing as part of a default judgment).[10] Thus, in the present case, while the Defendants' default deemed certain facts admitted (which in turn established their liability as a general matter), the default did not establish that they were liable to Parris for punitive damages. She was still obligated to meet her burden to show that the Defendants intentionally discriminated against her with malice or reckless disregard for her rights. The District Court acknowledged and applied this principal. *See* Ex. AB (Damages Ruling) at 4 (noting that "[t]he burden is on the plaintiff to establish its entitlement to recovery"). Indeed, the District Court specifically highlighted that an award of punitive damages "is not a matter of right but is within the discretion of the trier of facts and will depend upon the degree of wanton and willful conduct of the defendant.'" *Id.* at 18 (quoting *Flaks*, 504 F.2d at 707).

Moreover, in awarding punitive damages, the District Court did not rely on those allegations in the complaint deemed admitted by the default. *See generally* Ex. AB (Damages Ruling) at 18-25. Instead, the court relied upon the evidence in the record, with a particular focus on the evidence adduced during the two-day, contested hearing on damages at which the

---

[10] *Accord Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1152 (3d Cir. 1990) (recognizing that after a default, "punitive damages cannot be awarded simply on the basis of the pleadings," but instead, the entitlement to such damages must be established at a hearing); *Gober v. Terra & Corp. (In re Gober)*, 100 F.3d 1195, 1205 (5th Cir. 1996) (concluding "the default judgment against [defendant-debtor] did not entirely dispense with [plaintiff-creditor's] burden of proof" in a prior embezzlement action because "conduct sufficient to warrant punitive damages is not regarded as admitted by default"); *Meehan v. Snow*, 494 F. Supp. 690 (1980) (concluding allegations deemed admitted by default could not alone establish entitlement to punitive damages), *rev'd on other grounds*, 652 F.2d 274 (2d Cir.1981).

Defendants appeared with counsel and testified.  *See id.* at 22 (finding that the "*record* contains *evidence* that defendants acted willfully, maliciously and/or with reckless disregard for plaintiff's FHA rights when they failed to accommodate her disability.") (emphasis added); *id.* ("*there is evidence* that after plaintiff provided proof of her medical disability, defendants continued eviction proceedings until they were ordered by the Court to withdraw the action") (emphasis added); *id.* ("*the evidence* also indicates that defendants' actions inflicted emotional and physical harm to plaintiff") (emphasis added);  *id.* at 24-25 ("*The record* reflects [the Defendants] tried to take advantage of [Parris] for their own financial benefit.") (emphasis added).

In sum, as a matter of law, Parris was required to meet (and did meet) the burden to show an entitlement to punitive damages, notwithstanding the Defendants' default.

### b. The Parties Actually Litigated Whether Parris Was Entitled To An Award Of Punitive Damages

As a factual matter, there can be no dispute that the parties *actually litigated* whether Parris was entitled to punitive damages (as established through proof of the Defendants' intentional discrimination and malicious conduct).  As summarized above (*see supra* II.D-II.E), the District Court presided over days of hearings, accumulating an extensive record of documentary evidence, affidavits, and testimony from ten live witnesses, including expert testimony, medical testimony, and testimony from health department officials.  *See id.*  All such witnesses (including the Defendants and Parris) were scrutinized by the District Court and subject to cross-examination by counsel.  *See id.*  The Court entertained opening and closing arguments and received pre- and post-hearing briefings.   *See id.*  The Defendants were full and active participants in each step of this process.  The Defendants' theory that they never "actually litigated in the District Court" whether they "acted willfully, maliciously and with reckless disregard for Parris's civil rights" is simply false.

21

#4240748.6

### c. The Case Law That Cautions Against The Application Of Collateral Estoppel To Default Judgments Does Not Apply Here.

Although certain courts have opined that the doctrine of collateral estoppel usually does not apply with respect to default judgments, exceptions to this generality abound. *See Int'l Strategies v. Pomeroy (In re Pomeroy)*, 353 B.R. 371, 377 (Bankr. D. Mass. 2006) (acknowledging "that default judgments are generally not given collateral estoppel effect," but holding that a default judgment entered as sanction had preclusive effect in a 523(a) discharge proceeding). Many courts, including this Court, recognize that default judgments will still have preclusive effect where the debtor-defendant either: (i) substantially participated in the prior action; or (ii) engaged in litigation misconduct. *See, e.g.*, *Wright*, 187 B.R. at 833 ("the requirement that an issue be actually litigated to qualify for collateral estoppel does not imply that preclusion is only available for those issues established after a full evidentiary and adversary trial"); *Pomeroy*, 353 B.R. at 377 (listing examples); ); 18A Charles Alan Wright & Arthur R. Miller, FED. PRAC. & PROC. JURIS. § 4442 (2d ed.) (recognizing that preclusion is "fully appropriate as to issues resolved after a full scale contest on the issue of damages").

In the present case, the Defendants meet both exceptions, and thus, the Court should not hesitate to recognize the preclusive effect of the District Court Judgment. With respect to whether the Defendants substantially participated in that case, the record demonstrates that:

- Before the Defendants appeared in the case, their prior counsel attempted to negotiate a settlement on their behalf. *See* Ex. K (Ruling on Motion to Reopen) at 2; Ex. I ¶¶ 7-8.

- After the District Court rendered the default judgment, the Defendants appeared and unsuccessfully sought to have that judgment set aside. *See* Ex. K at 4.

- They appeared and testified at the damages hearing. *See generally* Ex. N & O (Damages Hearing Transcripts).

- They appeared and testified at the prejudgment remedy hearing. *See generally* Ex. AC (PJR Hearing Transcript).

22

- They participated in post-judgment discovery and related sanctions proceedings. *See generally* Ex. AJ (Order on Sanctions Mot.).

In short, for over eighteen months, the Defendants actively participated in all crucial phases of the Civil Rights Action.  Courts have given default judgments preclusive effect where the defendant in question participated far less than the Defendants in this case. *See Nestorio*, 250 B.R. at 55-57 (giving preclusive effect in § 523(a)(6) proceeding to prior default judgment and related award of punitive damages where, after default, the defendant appeared with counsel at the first day of the damages hearing but opted not to appear for the remainder of the hearing).

Equally applicable in this case is the litigation-misconduct exception to the general prohibition on applying collateral estoppel to default judgments.  In the Civil Rights Action, the Defendants have repeatedly abused and disrespected the judicial process.  Specifically:

- The Defendants refused to waive, and indeed, attempted to evade service of the Civil Rights Complaint. *See* Ex. K (Ruling on Motion to Reopen) at 2, 4.

- The District Court found that their submission seeking to set aside the default judgment to be "disingenuous" and further, that their failure to appear and defend was the result of "conscious decision or willfulness." *See id.* at 4.

- The Defendants admitted that before the damages hearing, they had destroyed evidence of Parris's problems with the septic system. *See* Ex. O at 150-51.

- While under an order to disclose and not dissipate their assets, the Defendants failed to disclose all assets, sold certain assets and attempted to sell others, and permitted the value of their property to decline through waste, non-payment of taxes, and the entry of mechanics' liens. *See* Ex. AC at 44-46, 50-53, 70-74, 86-87; Ex. AG at 62-64; Ex. AD ¶¶ 8-13; Ex. AE ¶¶ 6-8; Ex. AF ¶¶ 7, 9, 11-13.

- In post-judgment discovery, the District Court sanctioned the Defendants, finding "it was 'clear' defendants had not made a full disclosure [of assets] and offered no legitimate explanation for failing to follow the Court's order." *See* Ex. AJ at 1.

The Defendants should not stand to benefit from their willful default and subsequent abusive misconduct.  Courts are not troubled by giving preclusive effect to default judgments rendered against litigants who engage in misconduct of this sort or who, like the Defendants, have

willfully defaulted.  *See FDIC v. Daily (In re Daily)*, 47 F.3d 365 (9th Cir. 1995) (affirming ruling giving a default judgment preclusive effect in a nondischargeability action where default was entered a sanction against the debtor-defendant because he did not comply with discovery requests); *Bush v. Balfour Beatty Bahamas, Ltd. (In re Bush)*, 62 F.3d 1319, 1325 (11th Cir. 1995) (holding in a nondischargeability action that a default judgment has preclusive effect where a party "chooses not to [participate fully] and even attempts to frustrate the effort to bring the action to judgment"); *see also Pomeroy*, 353 B.R. at 377 (holding that a default judgment entered as a discovery sanction had preclusive effect in a 523(a) discharge proceeding).

## IV.    <u>CONCLUSION</u>

The Defendants had a full and fair opportunity to litigate the issue of whether their conduct was "willful and malicious."  They did so before the District Court, but did not prevail. Under the federal common law of collateral estoppel, they are now precluded from re-litigating their case.  For the purpose of this proceeding, it is established as a matter of law that the Defendants caused Parris a "willful and malicious injury."  As such, under Bankruptcy Code Section 523(a)(6), the Defendants' debts to Parris are not subject to discharge.

Accordingly, as to both Defendants, Parris requests that this Court enter a judgment directing that all sums owed to Parris by the Defendants are non-dischargeable under Section 523(a)(6), as such sums constitute a debt for willful and malicious injury to Parris.

#4240748.6

Date: February 1, 2013

DONNA PARRIS, PLAINTIFF


By:＿＿＿*/s/ Michael J. Coolican*＿＿＿
     Michael J. Coolican [ct28057]
     Katherine L. Lindsay [ct27971]
     BRACEWELL & GIULIANI LLP
     225 Asylum Street, Suite 2600
     Hartford, CT 06103
     Tel: (860) 947-9000
     Fax: (860) 246-3201
     Email: michael.coolican@bgllp.com
     Email: katherine.lindsay@bgllp.com

     Timothy Bennett-Smyth [ct27615]
     Greg J. Kirschner [ct26888]
     THE CONNECTICUT FAIR HOUSING CENTER
     221 Main St., 4th Floor
     Hartford, CT 06106
     Tel: (860) 263-0728
     Fax: (860) 247-4236
     Email: tsmyth@ctfairhousing.org
     Email: greg@ctfairhousing.org

     *Her attorneys*

#4240748.6

# APPENDIX OF
# UNREPORTED DECISIONS

Garner v. NGC Bodily Injury Trust, Slip Copy (2012)

2012 WL 3560816
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Gail GARNER as Administratrix of the Estate of
Angelo Palermo, Plaintiff,
v.
NGC BODILY INJURY TRUST, Defendant.

No. 11–CV–6567–CJS. | Aug. 16, 2012.

**Attorneys and Law Firms**

Michael J. Crosby, Esq., Honeoye, NY, for Plaintiff.

Judith A.Yavitz, Esq., Darger Errante Yavitz & Blau
LLP, New York, NY, for Defendants.

**Opinion**

## DECISION & ORDER

CHARLES J. SIRAGUSA, District Judge.

## INTRODUCTION

*1 **Siragusa, J.** This diversity asbestos litigation case is
before the Court on Defendant's motion to dismiss, filed
on April 4, 2012, ECF No. 9, and Plaintiff's crossmotions
for (1) leave to amend, filed May 9, 2012, ECF No. 18,
and (2) leave to file surreply, filed June 12, 2012, ECF
No. 23. For the reasons stated below, Defendant's motion
to dismiss is granted and Plaintiff's applications are
denied as futile.

## BACKGROUND

The following facts are taken from the Complaint, filed
November 17, 2011, ECF No. 1, and the documents
referred to in the complaint or upon which the complaint
relies. *See Roth v. Jennings,* 489 F.3d 499, 509 (2d
Cir.2007) ( "Documents that are attached to the complaint
or incorporated in it by reference are deemed part of the

pleading and may be considered."). This action is brought
by Gail Garner ("Plaintiff") as administratrix of the estate
of her father, Angelo Palermo ("Palermo"). NGC Bodily
Injury Trust ("Defendant," or "Trust") is the trust,
established in bankruptcy, which assumed asbestos claim
liability for National Gypsum Company. During
Palermo's life, National Gypsum Company was the
market leader in the manufacture, sale, and distribution of
asbestos-containing construction insulation products.

Palermo worked as a union insulation mason in the
construction industry for various employers from 1937
until 1966. Palermo was exposed to asbestos-containing
construction and insulation materials at work, including
personally handling and spray coating various
asbestos-containing materials. Plaintiff alleges that "[a]s a
union mason, [Palermo] would have worked with
National Gypsum Company construction and insulation
products regularly." Compl. ¶ 14. Palermo also worked
for National Gypsum Company directly in 1958.

Palermo died on April 23, 1966, at age 51. He was
survived at the time of his death by his wife and three
children, including Plaintiff. The death certificate stated
that Palermo's cause of death was "acute liver failure due
to metastatic cancer due to primary stomach." *Id.* ¶ 20;
Exhibit, Garner Decl., May 2, 2012, ECF No. 14.[1] The
doctor who signed the death certificate was a resident at
the time, and went on to practice cosmetic surgery .[2]
Plaintiff alleges that Palermo's family did not suspect
asbestos exposure as the cause of Palermo's death until
2000, when the family learned that a co-worker of
Palermo was diagnosed with mesothelioma.[3] Since then,
four other asbestos claim trusts have provided
compensation to Palermo's family for Palermo's
work-related asbestos exposure.

Nation Gypsum Company filed for bankruptcy protection
in 1990. In 1993, National Gypsum Company was
restructured and renamed Asbestos Claim Management
Corporation ("ACMC"). In 2002, ACMC again had to file
for bankruptcy reorganization under Chapter 11. The
Texas Bankruptcy Court approved the new reorganization
plan, which included the creation of Defendant NGC
Bodily Injury Trust to resolve all asbestosrelated bodily
injury claims. The plan was subsequently confirmed by
the Texas District Court on August 6, 2003. During the
bankruptcy reorganization process, all claims against
Defendant were tolled.

*2 Plaintiff filed a claim on behalf of Palermo with
Defendant on March 11, 2004. Defendant evaluated
Plaintiff's claim using the court approved Claims

Resolution Procedures ("CRP") and determined there was insufficient evidence to prove Palermo died of mesothelioma. Plaintiff then requested that the Trust consider Palermo's claim as an Extraordinary Claim under the CRP. The Trust denied this request. Next, Plaintiff requested nonbinding arbitration to review the Trust's decision. Such arbitration was held, and the Trust's denial of Palermo's claim was affirmed. Finally, Plaintiff rejected the nonbinding arbitration award and requested permission to commence this lawsuit, which the Trust granted on August 30, 2011. Plaintiff filed this action in on November 17, 2011.

Plaintiff also previously filed a similar action on April 5, 2010, against DII Industries, LLC ("DII Industries"). *Garner v. DII Industries, LLC,* No. 10–CV–6345–CJS, 2011 WL 573567, *1 (W.D.N.Y. Feb.15, 2011) (*"Garner I"* ). The defendants in that action had assumed asbestos claim liability for Harbison–Walker, among others, and Plaintiff alleged that they were liable for Palermo's death. *Id.* at *2. The claim was removed from New York State Supreme Court to this Court, and DII Industries filed a motion to dismiss on August 4, 2010. *Id.* at *1. In its Decision and Order dated February 15, 2011, this Court granted defendant's motion to dismiss on statute of limitations grounds. *Id.* at *5. The Court held that Plaintiff's claims of personal injury due to asbestos exposure accrued from the time they were aware of the injury, specifically at the time of Palermo's death in 1966. *Id.*

In the present action, Plaintiff alleges that Defendant is liable for Palermo's death. Plaintiff also makes claims of fraud and breach of fiduciary duty.[4] Defendants filed a motion to dismiss the complaint on April 3, 2012, ECF No. 9, pursuant to Fed.R.Civ.P. 12(b)(6). Defendant contends that Plaintiff's claims are barred by collateral estoppel, the applicable statute of limitations, and other available defenses. Plaintiff responded in opposition to Defendant's motion on May 2, 2012, ECF No. 12, and moved for leave to amend the complaint and response on May 9, 2012, ECF No. 18. Additionally, after Defendant filed reply papers, Plaintiff filed motion for leave to file sur-reply in opposition to Defendant's motion to dismiss, ECF No. 23.

## STANDARDS OF LAW

*Motion to Dismiss*
The U.S. Supreme Court, in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007),

clarified the standard to be applied to a 12(b)(6) motion:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a Plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*3 *Id.* at 555 (citations and internal quotations omitted). *See also, ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (quoting *Bell Atl. Corp. v. Twombly* ) (footnote omitted); *Iqbal v. Hasty,* 490 F.3d 143, 2007 WL 1717803 (2d Cir. Jun.14, 2007) (Indicating that *Bell Atl. Corp. v. Twombly* adopted "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible[,]" as opposed to merely conceivable.) When applying this standard, a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers,* 192 F.3d 52, 56 (1999), *cert. denied,* 531 U.S. 1052, 121 S.Ct. 657, 148 L.Ed.2d 560 (2000). On the other hand, "[c]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss." *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995) (citing *In re American Express Co. Shareholder Litig.,* 39 F.3d 395, 400–01 n. 3 (2d Cir.1994)).

*New York Statute of Limitations*

Garner v. NGC Bodily Injury Trust, Slip Copy (2012)

Under New York Civil Practice Law and Rules, personal injury claims must be brought within three years. N.Y. C.P.L.R. § 214(5) (McKinney's 2012). In 1986, however, § 214–c was enacted as a remedial measure for actions resulting from the exposure of harmful substances. The purpose of this provision was to provide relief to individuals whose latent injuries did not manifest within three years of exposure, and thus, would have otherwise been barred. *See Jensen v. General Elec. Co.*, 82 N.Y.2d 77, 84, 603 N.Y.S.2d 420, 623 N.E.2d 547 (1993). The statute provides:

> the three year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body or upon or within property must be commenced *shall be computed from the date of discovery of the injury* by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier.

N.Y. C.P.L.R. § 214–c(2) (McKinney's 2012) (emphasis added). In determining the meaning of "discovery of the injury" as used in § 214–c, the New York Court of Appeals has held:

> It is apparent from [the legislative] history that, in enacting a new "discovery" rule for the commencement of toxic torts, the Legislature had in mind *only the discovery of the manifestations or symptoms of the latent disease* that the harmful substance produced.... Given that narrow focus, the only reasonable inference is that when the Legislature used the phrase "discovery of injury" it meant discovery of the physical condition and not, as plaintiff argues, the more complex concept of discovery of both the condition and the nonorganic etiology of that condition.

*4 *Wetherill v. Eli Lily & Co. (In re N.Y. County DES*

*Litig.),* 89 N.Y.2d 506, 514, 655 N.Y.S.2d 862, 678 N.E.2d 474 (1997) (emphasis added).

Section 214–c, subsection (4) provides additional relief where the individual discovers the injury, but does not make the connection between the injury and the toxic cause of the injury within the three year period, as computed by subsection (2). In such a case, if the individual discovers the cause within five years of discovering the physical injury, that individual is allowed to timely file suit within one year of discovering the cause. N.Y. C.P .L.R. § 214–c(4) (McKinney's 2012). However, in order to invoke § 214–c(4) the claimant must show "that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined prior to the expiration of the [three year] period." *Id.*

## ANALYSIS

### Personal Injury Claims

Plaintiff claims that Defendant is liable for the personal injuries Palermo sustained as a result of his exposure to Defendant's asbestos containing products. Compl. ¶¶ 44–51, 59–69. Defendant contends that Plaintiff's claims are barred first, by collateral estoppel, and second, by the applicable statute of limitations.

The doctrine of collateral estoppel, or, issue preclusion, forecloses a party from relitigating an issue in a subsequent proceeding that was clearly raised in a prior proceeding and was necessarily decided against that party. *Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). The Second Circuit has held that in order for collateral estoppel to apply:

> (1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

*Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir.1986). The Court finds that Plaintiff's personal injury claims are barred by the doctrine of collateral estoppel.

In *Garner I,* Plaintiff brought a personal injury claim against DII Industries arising from the same facts and circumstances as Plaintiff's personal injury claims in the present action. The issue of the proper accrual date in that action is identical to the issue in the present action. This Court decided that Plaintiff's personal injury cause of action accrued from the time of Palermo's death in 1966, when Plaintiff had full knowledge of the claimed injury. *Garner I,* 2011 WL 573567 at \*5. Therefore, the doctrine of collateral estoppel precludes Plaintiff from arguing a different accrual date in the present action.

However, Plaintiff maintains that collateral estoppel does not apply because Plaintiff appealed the prior decision, but settled before the appeal reached determination on the merits. The Court disagrees. First, the fact that Plaintiff resolved her appeal by settlement means that Plaintiff had full opportunity to litigate the issue decided in *Garner I.* Cf. *Johnson v. Watkins,* 101 F.3d 792 (2d Cir.1996) (collateral estoppel does not apply "[i]f a party has not had an opportunity to appeal an adverse finding"). Second, even if there were an unresolved appeal, that would not foreclose the application of collateral estoppel. *Sherman v. Jacobson,* 247 F.Supp. 261, 270 (S.D.N.Y.1965) ("Generally, the possibility of appeal ... does not prevent the application of the doctrine of collateral estoppel."); *see also Huron Holding Corp. v. Lincoln Mine Operating Co.,* 312 U.S. 183, 189, 61 S.Ct. 513, 85 L.Ed. 725 (1941) (pending appeal does not detract from the decision's decisiveness).

\*5 Moreover, even if the doctrine of collateral estoppel did not apply, the Court finds that Plaintiff's action would be barred by the New York statute of limitations. The discovery of the injury for the purposes of § 214–c is the time "the manifestations or symptoms of the latent disease" became apparent. *Wetherill,* 89 N.Y.2d at 514, 655 N.Y.S.2d 862, 678 N.E.2d 474. In Palermo's case, the latest possible date of discovery of his injury was at the time of his death in 1966. The alleged discovery in 1999 is, by definition, a discovery of the *cause* of the injury and not, as Plaintiff argues, discovery of the injury itself. *See id.* at 513, 655 N.Y.S.2d 862, 678 N.E.2d 474 ("[D]iscovery that a plaintiff's symptoms were attributable to an injury inflicted by an outside force is the same as "discovery of the cause of the injury" within the meaning of CPLR 214–c(4)...."). Even if New York's "second injury rule" applies, as Plaintiff contends, the physical symptoms of the alleged injury to Palermo's mesothelial cells were apparent at the time of Palermo's death. *See Fusaro v. Porter–Hayden Co.,* 145 Misc.2d 911, 548 N.Y.S.2d 856, 860 (N.Y.Sup.Ct.1989) ("[T]he time to commence litigation does not begin to run on a

separate and distinct injury until that disease becomes manifest."). Thus, given that death is a clear manifestation of the injury, the "second" injury would accrue from 1966 as well.

Plaintiff further maintains that the New York state limitations period is preempted by the Federal accrual date provided by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), codified in 42 U.S.C. § 9658. This statute provides that actions for personal injury "caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility" shall accrue from "the date the plaintiff knew (or reasonably should have known) that the personal injury ... [was] caused or contributed to) by the hazardous substance." 42 U.S.C. § 9658. Plaintiff is incorrect, however, in asserting that this Federal accrual date applies to the present action. It is clear that exposure to asbestos in the workplace does not constitute a release into the environment, as required by the statute. 42 U.S.C. § 9601(22) ("The term "release" ... excludes (A) any release which results in exposure to persons solely within a workplace...."); *Covalt v. Carey Canada Inc.,* 860 F.2d 1434, 1439 (7th Cir.1988) (CERCLA accrual date does not apply to workplace asbestos exposure); *Ruffing v. Union Carbide Corp.,* 192 Misc.2d 714, 746 N.Y.S.2d 350, 362 (N.Y.Sup.Ct.2002) (exposure to hazardous material within the workplace does not trigger CERCLA). Thus, CERCLA provides no relief for Plaintiff and the State statute of limitation applies.

Finally, Plaintiff argues that the Trust waived its right to assert a statute of limitations defense. Plaintiff reasons that because the Trust evaluated Palermo's claim on the merits during the claims resolution process, the trust is estopped from raising a limitations defense in this action. Pl.'s Mem. In Opposition, May 2, 2012 at 19, ECF No. 12. However, under the Federal Rules of Civil Procedure, the statute of limitations is an affirmative defense that is only waived if it is not raised in a responsive pleading. Fed.R.Civ.P. 12(h); *Santos v. Dist. Council of New York City,* 619 F.2d 963, 967 (2d Cir.1980) ("[T]he statute of limitations constitutes an affirmative defense, to be asserted in a responsive pleading."). Furthermore, the Trust's CRP specifically reserves all defenses if a claim resorts to a lawsuit. First Am. Claims Resolution Procedures at 14–15, Hilton Decl., Exhibit D, May 16, 2012, ECF No. 21–4 ("All claims and defenses that exist under the law of the Applicable Jurisdiction shall be available to both sides at trial.").[5] Thus, the statute of limitations defense was not waived by the Trust and was properly asserted in Defendant's motion to dismiss.

Garner v. NGC Bodily Injury Trust, Slip Copy (2012)

*Wrongful Death Claim*

*6 In addition to the personal injury claims, Plaintiff makes a claim of wrongful death against the Trust. Compl. ¶¶ 70–75. Defendant has responded that Plaintiff's wrongful death claim is barred by the two year statute of limitations under New York law. The Court agrees that Plaintiff's wrongful death claim is also barred. Section 5–4.1 of the New York Estates, Powers and Trusts Law (McKinney's 2003) provides that "an action to recover damages for a wrongful act, neglect or default which caused the decedent's death" shall be commenced "within two years after the decedent's death." Accordingly, Plaintiff's wrongful death claim was barred from two years after Palermo's death in 1966.

*Fraud Claim*

Plaintiff also makes a claim of fraudulent misrepresentations against the Trust. Compl. ¶¶ 52–58. Plaintiff's allegations, in relevant part, consist of the following:

> Upon information and belief, National Gypsum Company engaged in concerted action with other manufacturers and sellers of construction and insulation materials containing asbestos to conceal full knowledge about the hazards of asbestos from the public, purchasers, employees and end-users such as Angelo Palermo.

*Id.* ¶ 56. Rule 9(b) of the Federal Rules of Civil Procedure requires that claims of fraud be pled with particularity. This requires that the plaintiff: "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Harsco Corp. v. Segui,* 91 F.3d 337, 347 (2d Cir.1996). Plaintiff's allegations fail to meet these particularity requirements. Since Plaintiff's Proposed Amended Complaint fails to remedy the particularity deficiencies, Plaintiff's motion for leave to amend the complaint, ECF No. 18, is denied as futile. *Foman v. Davis,* 371 U.S. 178, 182–83, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Plaintiff's motion for leave to file sur-reply is likewise futile, considering all of Plaintiff's claims are subject to dismissal.[6] *Id.*

**CONCLUSION**

Although the Court is sympathetic to Ms. Garner's position regarding the loss of her father, the law requires that Defendant's motion to dismiss the complaint, ECF No. 9, be granted in its entirety. As a result, Plaintiff's motions for leave to amend, ECF No. 18, and leave to file sur-reply, ECF No. 23, are denied as futile. The Clerk shall enter judgment for Defendant and close the case.

IT IS SO ORDERED.

Footnotes

1    The death certificate is referenced in the Complaint, thus considered part of the complaint.

2    This information is contained in Garner's declaration, thus, not part of the complaint. However, it is also contained in this Court's decision in a predecessor case, *Garner v. Dll Industries, LLC,* No. 10–CV–6345–CJS, 2011 U.S. Dist. LEXIS 15072, at *3, 2011 WL 573567 (W.D.N.Y. Feb 15, 2011).

3    Plaintiff later states in her declaration that Palermo's family learned of the co-worker's diagnosis in September 1999, and not in 2000 as indicated in the complaint. *See* Garner Decl. ¶ 15, May 2, 2012, ECF No. 13. This disparity, though, does not affect the disposition of the case.

4    Plaintiff's Proposed Amended Complaint, May 9, 2012, ECF No. 18–2, and supporting Affidavit, May 9, 2012, ECF No. 18, however, seek to withdraw Plaintiff's "Sixth Cause of Action," which alleged breach of fiduciary duty.

5    The CRP is referenced in the Complaint and therefore is considered part of the complaint. *See* Compl. ¶¶ 27, 32–33, 38–39.

6    The Court received a message from Plaintiff requesting leave to file reply papers regarding Plaintiff's motion for leave to file sur-reply (ECF No. 23). Plaintiff correctly noted in her motion that W.D.N.Y. Loc. R. Civ. P. 7(b)(2)(B) requires such reply to be filed within seven days of service of responding papers, which Plaintiff failed to do. Furthermore, the Court finds no reason to grant Plaintiff leave to file a reply in defense of her sur-reply motion because the proposed sur-reply merely restates arguments already contained in Plaintiff's response memorandum.

Garner v. NGC Bodily Injury Trust, Slip Copy (2012)

End of Document

© 2012 Thomson Reuters. No claim to original U.S. Government Works.